IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMESON YOUNG,

               Plaintiff,

   v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY,

           Defendant.

CIVIL ACTION
NO. 21-4375

## OPINION

**Slomsky, J.**                                                            **May 2, 2023**

### TABLE OF CONTENTS

I.    **INTRODUCTION** ........................................................................................................... 1

II.  **BACKGROUND** ............................................................................................................. 2

   A.  **The April 9, 2021 Meeting** ..................................................................................... 3

   B.  **SEPTA's Disciplinary Proceedings Against Plaintiff** ........................................ 5

III. **STANDARD OF REVIEW** ........................................................................................... 11

IV. **ANALYSIS** ..................................................................................................................... 12

   A.  **Summary Judgment Will Be Denied on the Whistleblower Law Claim
       Alleged in Count I of the Complaint** ................................................................... 13

     1.  The Pennsylvania Whistleblower Law ...................................................... 13

       a.  Wrongdoing:  Violations of the Pennsylvania Wiretap Act ...................... 15

          i.    Plaintiff Possessed an Expectation That His Oral Communication
              Would Not Be Intercepted ................................................................. 16

          ii.   Plaintiff's Expectation Is Reasonable under the Circumstances ........................... 17

      b.    Causal Connection ................................................................. 19

    2.    SEPTA Has Provided a Legitimate Non-Retaliatory Reason
          for Transferring Plaintiff ................................................................. 20

    3.    Genuine Disputes of Material Fact Exist as to Whether SEPTA's Proffered
          Legitimate Non-Retaliatory Reasons for Transferring Young
          Were Mere Pretext ................................................................. 21

**B.**    **Summary Judgment Will Be Granted in SEPTA's Favor on the Section 1981
        Reverse Race Discrimination Claim Alleged in Count II of the Complaint
        Because Plaintiff Fails to Identify a Policy, Custom, or Deliberate
        Indifference by SEPTA as Required under <u>Monell</u>** ................................. 22

**V.**  **CONCLUSION** ................................................................. 28

## I.      INTRODUCTION

Plaintiff Jameson Young, a Caucasian, was employed by Defendant Southeastern Pennsylvania Transportation Authority ("Defendant" or "SEPTA") as Maintenance Manager at its 69th Street Station.  As Maintenance Manager, Plaintiff was responsible for ensuring that train cars were maintained and repaired on time.  Concerned that he would not repair enough train cars by the end of fiscal year 2021, Plaintiff had a meeting with twenty of his subordinates.  At the meeting, Plaintiff engaged in a profanity-laced speech in which he encouraged his subordinates to violate SEPTA's overtime and Family Medical Leave Act ("FMLA") policies.

Two African American employees under Plaintiff's tutelage recorded his statements without his consent and sent the recording to his supervisor.  Thereafter, Plaintiff's supervisor met with him, discussed the recording, issued him a written reprimand, and then transferred him to the Fern Rock Station.  At the meeting, Plaintiff informed his supervisor that making the recording was illegal.

Based on this sequence of events, Plaintiff filed suit against SEPTA alleging that it (1) retaliated against him in violation of the Pennsylvania Whistleblower Law for reporting the illegal recording and use of his statements and (2) discriminated against him because of his race, in violation of 42 U.S.C. § 1981 under what is known as the catspaw theory of liability.[1]  SEPTA now moves for summary judgment in its favor on these claims.  (Doc. No. 31.)

---

[1]   Under a catspaw theory, liability for unlawful discrimination attaches to an employer who takes an adverse action, i.e., termination, suspension without pay, or lateral transfer in some cases, see infra, against an employee "when an employee with a discriminatory purpose essentially convinces a supervisor to take an adverse action against another employee."  Dolan v. Penn Millers Ins. Co., No. 09-2041, 2014 WL 2047897, at *11 (M.D. Pa. May 19, 2014) (footnote omitted).

1

## II.    BACKGROUND

On or about December 14, 2015, Plaintiff was hired by SEPTA as a rail vehicle electrical/electronic maintainer.  (Doc. No. 31-1 at 1.)  As part of his onboarding process, Plaintiff was required to complete SEPTA's orientation process during which he received and reviewed SEPTA's policies, procedures, and work rules.  (Id. at 2.)  To be promoted within SEPTA, employees are required to complete an application, be selected for an interview, attend the interview, and be selected by a panel of decisionmakers.  (Id.)

In 2019, Plaintiff applied for the position of Maintenance Manager.  (Id.)  On or about October 23, 2019, he was offered the position of Maintenance Manager at 69th Street Station.[2] (Id.)  On or about November 18, 2019, Plaintiff began working as Maintenance Manager running the Carhouse.[3]  (Id.)  About one year later, Plaintiff accepted a transfer to the Vehicle Overhaul side of 69th Street Station.[4]  (Id.)  He remained the Maintenance Manager while working at the Carhouse and Vehicle Overhaul.  (Id.)

As Maintenance Manager, Plaintiff supervised and managed several classes of employees, including Mechanic First and Third Classes, Specialists, and Electrician First Class.[5] (Id. at 3.)  In

---

[2]  His starting salary as Maintenance Manager was $73,788.00 annually.  (Doc. No. 31-1 at 4.)  During his employment as Maintenance Manager, he received two annual merit increases and his salary rose to over $80,000.00 annually.  (Id.)

[3]  Plaintiff's responsibilities and duties specific to the Carhouse included ensuring that state inspections and repair and maintenance were completed properly and on time.  (Id.)  He "was also to make sure that the cleaners up at the platform [of the train station] were on duty."  (Doc. No. 23-5 at 58.)

[4]  His responsibilities and duties as Maintenance Manager specific to Vehicle Overhaul included ensuring that the vehicle overhaul program was completed on time and that the cars were sent to the Carhouse on time.  (Doc. No. 31-1 at 3.)

[5]  According to Plaintiff's performance review for 2022, he met expectations and his manager commented that he "he demonstrated a high level of Management capability."  (Doc. No. 34-8 at 2.)

addition, he was required to ensure that the work he and the employees he supervised completed was done safely, properly, and efficiently.  (Id.)  Plaintiff also was responsible for ensuring that the work performed in his department was performed within a designated budget.   (Id.) Furthermore, because Plaintiff was a Salary Administrative Management ("SAM") employee, he was obligated to comply with certain management-level policies of SEPTA as well as with policies governing all SEPTA employees.  (Id.)

### A.     The April 9, 2021 Meeting

On April 9, 2021, Plaintiff held a meeting with twenty of his subordinates in the cafeteria at 69th Street Station to discuss the number of cars that needed to be completed for the remainder of fiscal year 2021.[6]  (Id. at 4.)  At that time, two employees of an outside engineering firm hired by SEPTA also were in the cafeteria.  (See Doc. No. 23-5 at 79.)  Plaintiff acknowledged during his deposition that all SEPTA employers and contractors use the cafeteria.  (See id. at 80.)  In addition, he testified that "anybody that wants to use [the cafeteria] could do so, including, for example, if there is "a training class, it's held there, guys that are the instructors or the trainees will go in there and have their break."  (Id.)

---

[6]   An unsigned investigation report authored by SEPTA's Office of Inspector General (the "Inspector General Report" or "Report"), dated December 10, 2021, stated that Plaintiff held the meeting with the "15 Rail Body Mechanics" he supervised.  (Doc. No. 28-4 at 1.)  However, Defendant asserts that the Inspector General Report is inadmissible hearsay because it is not signed by any SEPTA employee and cannot be considered an admission by SEPTA because the Office of Inspector General is independent from SEPTA.  (See Doc. No. 45 at 7.)  But the Court need not decide whether the Report is admissible in evidence and can be used for purposes of summary judgment because, for reasons stated infra, there are genuine disputes of material fact regarding whether Plaintiff's expectation of privacy in the cafeteria is reasonable independent of the Report's admissibility.  It is mentioned only because Plaintiff relies upon it.

Two of Plaintiff's subordinates named Scott Marshall and Corey Evans were also in the cafeteria and made a video recording of his statements.  (Doc. No. 31-1 at 6.)  The following are excerpts of Plaintiff's statements recorded by Marshall and Evans at the meeting[7]:

> Some shits going to get a little stringent with a sign in and out book.  Ah rumors going around some videoing cars people working shits got a stop. . . .
>
> I don't like doing write ups, I don't like any of that shit.  [John] Buzzelli has no say on that floor or what happens.  He signs the papers because he is the assistant director.  Any choices that goes on over time, shifts I make up and decide and let him have a paper trail.
>
> So if there [is] any theory he []is behind your cut overtime it[']s not.  Your workload was cut congratulations bend the fuck over.  I just promised 32 cars will be finished by June 30th.  We have 24 done we need to give them 8 more.  So that means we need to get 1001 and 2, 1011 and 12 which is not a 2.0 is going over there means the welders are going to get what ever the fuck they want for overtime.
>
> 1014 and 17 becoming a bastard marriage.  1018 on hold[,] 1013's on hold next wee[k] . . . 1017 already being worked on by Tom[,] you guys are doing 1014. . . . 101 and 1014[,] 1017 will be the next two to go out[.]  1015 [and] 16 come off the line running no issues[.]  [T]hat is a 2.0 and that's our 4 cars we need to finish by June 30th.  That's 11 weeks 3 days.  That means I'll open your overtime book back to full fucking service.  You can work every day but Saturday because there is no one to watch you Saturday and Sunday.  You want to work doubles fucking Monday through Friday it[']s yours.  But I need to know these cars are going to get out.
>
> Obviously if we can't get the parts that's another thing[,] but the work needs to be completed and all the bullshit and animosity towards one another videoing trying to make a claim of whatever it is someone else is doing.  I don't give a shit it needs

---

[7]   It appears that Richard Ziegler created the transcript of the recording.  Ziegler is SEPTA's Assistant Chief Officer for Vehicle Maintenance.  (See Doc. No. 31-1 at 6.)  On June 7, 2021, Ziegler sent an email to Laila Burns, who is SEPTA's Employee Relations Manager, and Kafi McCaskill, who is SEPTA's Equal Employment Opportunity Coordinator.  (See id. at 6, 8.)  In the email, Ziegler stated that a recording of the April 9, 2021 meeting was sent anonymously to him on the morning of June 4, 2021.  (See Doc. No. 23-8 at 3.)  In the beginning of the transcript, the following language appears:  "The following is a transcript of a recording that was sent to me via text message on Friday June 4th at 8:28 am.  The recording was from an April 9th meeting conducted by Manager Jameson Young and a group of 1st class carbody mechanics at 69th street shop."  (Doc. No. 23-7 at 2.)  Based on the timing described in the transcript and in Ziegler's email to Burns and McCaskill, it appears that Ziegler transcribed the recording of the April 9, 2021 meeting sometime between June 4 and June 7, 2021.

to stop.  If you want your overtime back it came back, I said it would eventually shit hit[s] the fan.  They need these cars[.]  I made the promise of 32 cars.

It[']s up to you how you guys want to run it.  You want the overtime your work doubles again Monday through Friday you get 40 hours of overtime[.]  [H]ere's your chance[.]  [T]he deal is those cars have to be done.

. . .

You guys want your overtime back because I know that [is] a thing so here it is.

Like I said eventually it would come back around.  When they're going to need the fucking cars and you guys are going "open book" now it is.

. . .

Starting today through your overtime book out the fucking window you guys are fucking starting today carte blanche.  You guys want to work 8 today stay six stay six don't give a shit.  Just as long as the cars get done.  . . .  There is a theory going around the floor that someone else is doing something behind my back that [they're] pulling strings, come ask me and I beat to my own drum and do whatever the fuck I want.  My job is to get my goal is to move up.  I want to be an [assistant director]. I don't want to be stuck as a manager son [sic] you guys make me look good[,] you make John look good; I get to move up quicker.  Not trying to stab any of you in the back[,] not trying to screw anybody out of anything[.]  I don't give a shit if you use FMLA all God damn day long.  I could care less it[']s your fucking time.  I don't care if you call out sick after you use 3 fucking days of overtime.  Who the fuck cares as long as the cars are getting done?

. . .

I handle any slack quotes is open[.]  [T]here is no fucking quotas for you guys.  You want a day off you get it.

. . .

I am going to tell Ryan unlimited overtime . . . .

. . .

[S]tarting today you guys get 8 hours of overtime every day of the week . . . besides Saturday and Sunday.

(Doc. No. 23-7 at 2-6.)

### B.    SEPTA's Disciplinary Proceedings against Plaintiff

On June 4, 2021, the same day Ziegler received the recording, Plaintiff met with Ziegler and Blanche West, who was SEPTA's then-Acting Director of Vehicle Maintenance, to discuss his conduct at the April 9, 2021 meeting.[8]  (Doc. No. 31-1 at 7.)  Plaintiff heard the recording for

---

[8]  Plaintiff's union representative, Michael Keyes, participated in the June 4, 2021 meeting by phone.  (Id. at 7.)

the first time at this meeting.  (Id.)  During the meeting, Plaintiff confirmed to Ziegler and West

that he was the one talking in the video and spoke about how many cars needed to be complete for

fiscal year 2021 and the overtime.  (Id.; see also Doc. No. 23-8 at 3.)  Plaintiff also expressed to

Ziegler and West his belief that Evans and Marshall illegally recorded him.[9]  (Doc. No. 31-1 at

7.)[10]  In response, Ziegler told Plaintiff "that the recording was sent to him and that [he] was

addressing the contents of the recording."  (Id.)

      At the end of the June 4, 2021 meeting with Ziegler and West, Plaintiff was told that he

would be temporarily transferred to SEPTA's Fern Rock Station.[11]  (Id. at 8.)  Six days later,

Ziegler forwarded the recording of the April 9, 2021 meeting to SEPTA's Employee Relations

Manager Laila Burns and SEPTA's Equal Employment Opportunity ("EEO") Coordinator Kafi

McCaskill for further investigation of Plaintiff's behavior.  (Id.)  Burns sent an email to Ziegler

expressing her concern with Plaintiff's conduct during the April 9, 2021 meeting and the need to

take action against Plaintiff.  (Id. at 9.)  Burns recommended that Plaintiff be issued "at least a

written warning," attached a template for written warnings, and offered her assistance in the

matter.[12]  (Id.)

---

[9]  The first time Plaintiff complained to any management-level official at SEPTA about the
recording was at the June 4, 2021 meeting with Ziegler and West.  (Id.)

[10]  Plaintiff testified at his deposition that Ziegler told him that he found "nothing offensive or
wrongdoing about this video, but I got to do what I got to do because they're making a big stink
about this."  (Doc. No. 23-5 at 114.)  Plaintiff believes that "they" refers to Marshall and Evans.
(Id.)  Defendant, on the other hand, maintains that "Young's self-serving testimony that Ziegler
was not personally offended by Young's conduct is wholly irrelevant to the question of whether
that conduct violated SEPTA's policies – there is no dispute that it did."  (Doc. No. 35 at 4.)

[11]  Plaintiff also testified at his deposition that following the June 4, 2021 meeting with Ziegler,
only Plaintiff's schedule, and not that of other managerial employees, changed on a weekly
basis.  (See Doc. No. 34-6 at 129-31.)

[12]  Burns provided suggested edits to the written warning and recommended that Ziegler include
the applicable SEPTA policies and notes from Ziegler's June 4 meeting with Plaintiff.  (Id.)

Earlier, on June 5, 2021, Plaintiff sent to McCaskill an internal complaint alleging that Evans and Marshall illegally recorded him during the April meeting and that Ziegler transferred him to Fern Rock Station in retaliation for writing up Evans and Marshall for various reasons. (Id.; Doc. No. 23-10 at 2.) The internal complaint states, in relevant part:

> . . . I was the VOH shop manager up until Friday June 4, 2021, when I was brought up to the conference room at the 69th St. carhouse, and told by Richard Ziegler and my director Blanche West, that I would be removed and sent to Fern Rock for complaints that I intimidate employees. They proceeded to play a secretly recorded, edited video, done by an employee, of a meeting I held in the upstairs cafeteria two months ago. They explained that the employee who taped the video feels intimidated. First, this recording was done without my knowledge and under Pennsylvania wiretapping laws, all parties must give consent to any taping. . . .

(Doc. No. 23-10 at 2.)

On June 9, 2021, SEPTA received Plaintiff's complaint and responded by instructing him to complete SEPTA's internal Equal Employment Opportunity ("EEO") Intake Questionnaire (the "Questionnaire"). (Id.) On June 13, 2021, Plaintiff submitted a completed Questionnaire. (Id.) Then, on June 18, 2021, SEPTA's EEO Department sent an email to Plaintiff stating that his "complaint does not meet the requirements for discriminatory treatment as defined in the federal, state, and local laws upon which SEPTA's EEO policies are grounded." (Id. at 10; Doc. No. 23-12 at 2.)[13]

---

[13] According to a November 9, 2021 email from Jennifer F. Hinderliter, who is SEPTA's EEO & Employee Relations Manager, to Allison DeMatteo, whose position in SEPTA is not described by either party, Evans filed an EEOC Charge alleging that SEPTA and Plaintiff discriminated against him because of his race. (Doc. No. 34-7 at 1.) The earliest Evans filed the EEOC Charge is August 2021 since the November 9, 2021 email references an allegation by Evans that he internally reported Plaintiff's behavior during that month. Also, as discussed infra, because the email is hearsay and Plaintiff has not listed in his pretrial memorandum either Hinderliter or DeMatteo as a witness he intends to call at trial, the email will not be considered for summary judgment purposes. See F.O.P. v. City of Camden, 842 F.3d 231, 238-39 (3d Cir. 2016).

On June 29, 2021, Plaintiff met with Ziegler, West, and Michael Keyes—Plaintiff's union representative. (Doc. No. 31-1 at 10.) During the meeting, Plaintiff was presented with a Written Notice of Charges/Reason for a Written Warning ("Written Warning") dated June 15, 2021. (Id.) The Written Warning stated that Plaintiff's conduct during his April 9, 2021 meeting violated SEPTA's policies.[14] (Id.) Specifically, the Written Warning stated the following:

> As a manager you are responsible for ensuring that SEPTA's policies are applied correctly and strictly adhered to. These programs are in place for a reason, and it is your responsibility as a manager to enforce these policies regardless of your opinion. Lastly, as a publicly funded agency we are expected to be good stewards with our funding and resources. We are expected to operate within the budget parameters that are established. Your statement to "throw your overtime book out the fucking windows you guys are fucking starting today carte blanche" is completely misguided and unacceptable as a manager in a position of authority. It is your responsibility to review the workload and manages [sic] your resources accordingly to ensure that you consider ways to reduce expenditures, improve efficiencies all while ensuring employee production is at acceptable levels.

(Id.) Attached to the Written Warning was SEPTA's Harassment Prevention and Retaliation Policy. (Id.) Plaintiff refused to sign an acknowledgment that he received the Written Warning. (Id.) He also asserts that he was not formally disciplined pursuant to SEPTA policy because the Written Warning did not warn against future objectionable conduct. (See Doc. No. 23-5 at 131.)

Plaintiff asserts that Ziegler took adverse action against him because he had stood up to Joe Metz while Metz was Assistant Chief Mechanical Officer and also because he had written up Evans on some occasions. (Id. at 116-17.) Plaintiff testified at his deposition that: "The last write-up that I had, the same day that [Evans] came out with this video, was the day Corey Evans told

---

[14] Specifically, the Written Warning charged Plaintiff with two violations of Section IV.B of Policy #E21: (1) "[e]ngaging in behavior or conduct that is inappropriate and unacceptable in SEPTA's workplace"; and (2) "[e]ngaging in any behavior that is unruly, disruptive, interferes with a supervisor's/manager's direction, or is unprofessional, abusive, or threatening to others." (Doc. No. 23-13 at 2-3.) Plaintiff maintains that although he used inappropriate language, his conduct did not violate the cited SEPTA policies. (See Doc. No. 23-5 at 126-27.)

me he's untouchable.  Rich Ziegler is his friend, and there's nothing I could do about it."  (<u>Id.</u> at 117.)  Plaintiff alleges that he included in his write-up of Evans his comments about his friendship with Ziegler and that Plaintiff's transfer to Fern Rock Station was a direct result of his write-ups of Evans.  (<u>See id.</u> at 117-18.)  Plaintiff also mentioned in his internal complaint to SEPTA's EEO Department Evans's comments that his friendship with Ziegler will protect him from future disciplinary action and write-ups.  (<u>See</u> Doc. No. 23-10 at 2.)  In addition, Plaintiff also believes that Ziegler issued him the Written Warning because Ziegler "had a personal vendetta against [Plaintiff] because [he] stood up to Joe Metz months prior."  (Doc. No. 23-5 at 116-17.)  Moreover, Plaintiff cites other instances in which Ziegler and Metz engaged in inappropriate behavior but were not disciplined by SEPTA.[15]  (<u>See id.</u> at 113-14.)

After the June 29, 2021 meeting, Plaintiff appealed the Written Notice by filing a formal grievance through the Transport Workers Union Local 190 (the "Union").  (Doc. No. 31-1 at 10.) He wanted his written warning reduced to a verbal warning.  (<u>Id.</u> at 12.)  His grievance alleged that the conduct displayed in the recording was not unruly or abusive, his comments comported with the applicable contracts, the recording was unlawfully made, and the recording was missing several excerpts.  (<u>Id.</u> at 11-12.)  On July 13, 2021, Ed Carruthers, SEPTA's Director of Vehicle Maintenance, Fern Rock, conducted a "Level 1" hearing on Plaintiff's grievance.  (<u>Id.</u> at 12.)

---

[15] Plaintiff testified at his deposition that when he worked at SEPTA's Woodland Station—he does not provide a date or year when he worked at Woodland—Ziegler was "screaming down at Derek Hudson," who was the Acting Director of Vehicle Maintenance for Woodland Station: "You're a fucking moron and a fucking retard and this is why the thing derailed."  (Doc. No. 23-5 at 112.)  Plaintiff also testified that Joe Metz texted a sexually inappropriate message to a female SEPTA employee.  (<u>See id.</u> at 112-13.)  Importantly, Plaintiff does not ascribe any racial reasons to SEPTA's failure to discipline Ziegler or Metz, nor does Plaintiff know whether Ziegler ever was disciplined for his alleged use of profanity.  (<u>See id.</u> at 113-14.)

Michael Keyes, the union representative who had accompanied Plaintiff on the June 4, 2021 and June 29, 2021 meetings with Ziegler and West, represented Plaintiff at the Level 1 hearing.  (Id.)

On July 20, 2021, Carruthers denied the grievance.  (Id.)  In denying it, Carruthers stated, in pertinent part:

> Mr. Young's position that each statement outlined above was justified by contract language, shop quote standard practices and/or overtime policies fail to justify the manner in which these topics were communicated to employees.  In addition, SEPTA Managers are responsible for understanding and enforcing these policies and should seek guidance when a standard practice is unknown or unclear.

(Doc. No. 23-15 at 4.)  Regarding Plaintiff's allegations that the discipline should be reversed because his conversations were illegally recorded, Carruthers stated:

> Mr. Young's position that the discipline should be reversed considering consent to be recorded was not given would be a dereliction of duties on the part of management by failing to enforce SEPTA policies including disciplinary action for just cause.

> The intent behind an anonymous employee recording the conversation in question, then submitting it to SEPTA management is not taken into consideration regarding disciplinary action as the content within the video stands on its own and displays conduct unbecoming of a SEPTA Manager.

(Id.)  Carruthers concluded that Plaintiff violated "the policies cited above while interacting with employees" and that his language "displayed a lack of consideration for manpower quotas, use of overtime, governance of sick/FMLA benefits and professional communication."  (Id.)

Plaintiff then appealed Carruthers's decision.  (Id.)  He requested that all charges against him be dropped and that his disciplinary record be cleared.  (Id.)  On August 11, 2021, Michael A. Wright oversaw a second level hearing on his grievance.  (Id. at 13.)  Again, Plaintiff was represented by Michael Keyes.  (See Doc. No. 23-16 at 2.)  On August 20, 2021, Wright denied the appeal and stated that Plaintiff "admits to making the statements and managers should not speak to employees in this manner."  (Id. at 2-3.)  Wright also found there was no evidence

supporting Plaintiff's claim that the recording was edited and that Plaintiff's conduct in the recording "clearly violated" SEPTA policy.  (Id. at 3; Doc. No. 31-1 at 13.)

On November 9, 2021, several months after Plaintiff's transfer to Fern Rock Station, an email from Jennifer F. Hinderliter, SEPTA's EEO and Employee Relations Manager, was sent to Allison DeMatteo, another SEPTA employee.  (Doc. No. 34-7 at 1.)  In the email, Hinderliter noted that Evans filed with SEPTA's EEO Department an EEOC charge alleging that SEPTA and Plaintiff discriminated against him because of his race.  (Id.)[16]

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Hart v. Elec. Arts, Inc., 717 F.3d 141, 148 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  "A dispute 'is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.'"  Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 213 (3d Cir. 2017) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).  A disputed fact "is material only if it might affect the outcome of the suit under governing law."  Id.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists,

---

[16] Also, as discussed infra, because the email is hearsay and Plaintiff has not listed in his pretrial memorandum either Hinderliter or DeMatteo as a witness he intends to call at trial, the email will not be considered for summary judgment purposes.  See F.O.P., 842 F.3d at 238-39.  Once again, it is only mentioned because Plaintiff relies upon it.

the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Meditz v. City of Newark, 658 F.3d 364, 369 (3d Cir. 2011) (quoting Azur, 601 F.3d at 216). "The moving party is entitled to judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" Range v. AG United States, 53 F.4th 262, 269 (3d Cir. 2022) (quoting Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-49. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.    ANALYSIS

In the first Count of the two-count Complaint, Plaintiff alleges that Defendant violated the Pennsylvania Whistleblower Law when it retaliated against him for reporting the illegal recording and use of his statements by transferring him from 69th Street Station to Fern Rock Station. In Count II, he asserts that Defendant engaged in reverse race discrimination against him, in violation of 42 U.S.C. § 1981, when Ziegler, relying on Evans's racial animus toward Plaintiff, transferred

him to Fern Rock Station.  For reasons that follow, summary judgment will be denied on Count I,
but will be granted on Count II.

### A.      Summary Judgment Will Be Denied on the Whistleblower Law Claim Alleged in Count I of the Complaint

In Count I of the Complaint, Plaintiff claims that Defendant retaliated against him for
reporting wrongdoing that Plaintiff asserts is protected by the Pennsylvania Whistleblower Law.
(Doc. No. 1 at 6.)  Specifically, Plaintiff avers that Defendant retaliated against him when he was
disciplined and transferred after reporting that Scott Marshall and Corey Evans unlawfully
recorded his statements during the April 9, 2021 meeting without his consent.  (Id. at 5-6.)  In
addition, he alleges that the use of the illegally recorded statements against him by SEPTA
constitutes additional wrongdoing.   (See id. at 5.)   Defendant maintains, however, that it
disciplined Plaintiff only for legitimate, non-retaliatory reasons.  (Doc. No. 31-2 at 11.)  Because
there is a genuine dispute of material fact whether the Whistleblower Law was violated, summary
judgment on Count I will not be entered in Defendant's favor.

### 1.      The Pennsylvania Whistleblower Law

Section 1423 of the Pennsylvania Whistleblower Law provides, in relevant part, that:

> [n]o employer may discharge, threaten or otherwise discriminate or retaliate against
> an employee regarding the employee's compensation, terms, conditions, location
> or privileges of employment because the employee or a person acting on behalf of
> the employee makes a good faith report or is about to report, verbally or in writing,
> to the employer or appropriate authority in an instance of wrongdoing or waste by
> a public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a).[17]  A "good faith report" is one "made without malice or consideration of
personal benefit and which the person making the report has reasonable cause to believe is true."

---

[17] Neither party disputes that SEPTA is an employer or a public body as defined in the
Pennsylvania Whistleblower Law.

Id. § 1422.  Wrongdoing under that statute is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."  Id.

At the summary judgment phase of a case, the three-stage burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "applies to retaliation claims brought pursuant to [the Pennsylvania Whistleblower Law]."  McCowan v. City of Phila., No. 19-3326, 2022 WL 742687, at *38 (E.D. Pa. Mar. 10, 2022) (citing Anderson v. Bd. of Sch. Dirs. of Millcreek Twp. Sch. Dist., 574 F. App'x 169, 173 & n.4 (3d Cir. 2014)).  First, a plaintiff must produce evidence showing that a prima facie retaliation claim under the Pennsylvania Whistleblower Law has been established.  This "requires evidence that Plaintiff[]:  (1) reported an instance of wrongdoing or waste to an appropriate authority; and (2) there is a causal connection between the report and the alleged retaliation."  Frazier v. City of Phila., 441 F. Supp. 3d 76, 96 (E.D. Pa. 2020) (citing 43 P.S. § 1424(b)).

Second, if Plaintiff establishes a prima facie case of retaliation, then "the burden shifts to the defendant to show that the action it took occurred for legitimate reasons."  Id. (citing Johnson v. Res. for Hum. Dev., Inc., 789 F. Supp. 2d 595, 601 (E.D. Pa. 2011)); see also Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016) (holding that McDonnell Douglas analysis applies to questions regarding legitimate, non-retaliatory rationales at the summary judgment stage).  Third, if Defendant shows a legitimate reason for its action against Plaintiff, then the burden "shifts back to the Plaintiff to show the proffered reason is, in fact, pretextual."  Frazier, 441 F. Supp. 3d at 96.  As discussed below, viewing the evidence in the light most favorable to Plaintiff, he has

established a prima facie case of retaliation under the Whistleblower Law, the requirement at the first stage of the McDonnell Douglas framework.

### a.   Wrongdoing:  Violations of the Pennsylvania Wiretap Act

To establish that an employee reported wrongdoing under the first prong of Plaintiff's prima facie Whistleblower Law claim, the employee "must demonstrate []he made a report of some action by [his] employer or its agent, which, if proven, would constitute a violation of a law or regulation.  Moreover, the report must be of an actual violation, not a potential or contemplated violation."  Greco v. Myers Coach Lines, Inc., 199 A.3d 426, 434 (Pa. Super. Ct. 2018).  "It simply must be 'sufficient to identify the law [or regulation] allegedly violated.'"  Frazier, 441 F. Supp. 3d at 96 (quoting Sukenik v. Twp. of Elizabeth, 131 A.3d 550, 555 (Pa. Commw. Ct. 2016)).

Here, Plaintiff alleges as wrongdoing Marshall and Evans's illegal recording of his statements and Ziegler's subsequent use of the recording in deciding to transfer him to Fern Rock Station, in violation of the Wiretap Act.  "In general, the Wiretap Act prohibits the interception, disclosure or use of any wire, electronic or oral communication."  Commonwealth v. Mason, 247 A.3d 1070, 1080 (Pa. 2021) (internal quotation marks and citation omitted).  An oral communication protected by the Wiretap Act is one "uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation."  18 Pa. C.S. § 5702.  Consent to interception is a defense under the Wiretap Act.  See id. § 5704(4).

To establish a claim for interception under the Wiretap Act, the plaintiff:

must demonstrate:  (1) that he engaged in a communication; (2) that he possessed an expectation that the communication would not be intercepted; (3) that his expectation was justifiable under the circumstances; and (4) that the defendant attempted to, or successfully intercepted the communication, or encouraged another to do so.

Mason, 247 A.3d at 1081 (internal quotation marks omitted) (quoting Agnew v. Dupler, 717 A.2d 519, 522 (Pa. 1998)).   Additionally, an "extra-judicial publication of an illegally intercepted conversation constitutes a separate violation [of the Wiretap Act]."   Commonwealth v. Upshur, 924 A.2d 642, 650 (Pa. 2009) (citing 18 Pa. C.S. § 5703).   The parties do not dispute that Ziegler used the recording in disciplining Plaintiff.   Thus, if Plaintiff establishes a prima facie case of interception under the Wiretap Act, then he also establishes a prima facie case of illegal use under 18 Pa. C.S. § 5703(3).

It is undisputed that the first and fourth elements of interception under the Wiretap Act have been met here.   Plaintiff made oral statements during the April 9, 2021 meeting with fifteen to twenty of his subordinates and Marshall and Evans recorded Plaintiff's statements, which Evans anonymously submitted to Ziegler.   Thus, only the second and third elements of interception under the Wiretap Act are at issue here.

i.     **Plaintiff Possessed an Expectation That His Oral Communication Would Not Be Intercepted**

Addressing the second element of the interception claim—Plaintiff's expectation that his communication would not be intercepted—"the proper inquir[y] [is] whether the speaker had a specific expectation that the contents of the discussion would not be intercepted . . . ."   Matenkoski v. Greer, 213 A.3d 1018, 1029 (Pa. Super. Ct. 2019) (quoting Agnew, 717 A.2d at 523).   Plaintiff has identified sufficient evidence that would permit a reasonable jury to find that he possessed an expectation that his oral communication would not be intercepted.

When Plaintiff spoke to his subordinates, he did not expect that his statements would be recorded.   Plaintiff heard the recording of his statements at the April 9, 2021 meeting for the first time at his June 4, 2021 meeting with Richard Ziegler.   (Doc. No. 31-1 at 7.)   "Upon learning of the unlawful recording, Plaintiff repeatedly advised Defendant and Ziegler that their use of the

aforesaid recording was unlawful." (Doc. No. 1 at 4.)  Moreover, on June 5, 2021, Plaintiff wrote a letter addressed to Kafi McCaskill, SEPTA's Equal Employment Opportunity Coordinator. (Doc. No. 23-10 at 2.)  In his letter, Plaintiff stated that "this recording was done without my knowledge and under Pennsylvania wiretapping laws, all parties must give consent to any taping." (Id.)  Plaintiff also had referenced in the letter his belief that Marshall and Evans's recording was illegally obtained and he made this assertion in each of his grievance hearings.  (See Doc. Nos. 23-15, 23-16.)

While Plaintiff has identified sufficient evidence to allow a factfinder to find he had an expectation that his communications would not be intercepted, this does not end the inquiry under the Wiretap Act, however, because Plaintiff's expectation also must be justifiable under the circumstances.

### ii.    Plaintiff's Expectation Is Reasonable under the Circumstances

The third prong of a Wiretap Act claim asks whether an individual's expectation is "justifiable under the existing circumstances," or, stated differently, whether it "is one that society is prepared to recognize as reasonable."  Matenkoski, 213 A.3d at 1029 (internal quotation marks omitted) (quoting Agnew, 717 A.2d at 523).  While Pennsylvania courts have not established a bright-line rule identifying the reasonableness of privacy expectations in employee-only areas, several cases illustrate when an employee does not have a reasonable expectation of privacy that their communications would not be intercepted.  In contrasting the facts in these cases to the facts here, it is evident that Plaintiff has raised a genuine dispute of material fact that his expectation that his oral communication would not be intercepted was reasonable under the circumstances.

In <u>Agnew</u>,

> [A] police officer alleged that her chief violated the Wiretap Act by monitoring her squadroom conversations with another officer through an intercom system.  Our Supreme Court [in <u>Agnew</u>] held that these conversations were not "oral communications" under the Wiretap Act, because the officer did not possess a reasonable expectation of privacy in the conversations:  the squadroom door was open, all conversations could be heard without amplification in the chief's office, the chief had the light on in his office, and the intercom lines on squadroom telephones could have been open at any time.

<u>Matenkoski</u>, 213 A.3d at 1029 (citing <u>Agnew</u>, 717 A.2d at 524).[18]   In another case, the Pennsylvania Supreme Court held that there is no expectation of privacy where police officers'

> conversations occurred in broad daylight at the scene of an accident on a public roadway, to which state police officers responded.  The conversations took place within earshot and easy view of bystanders or passersby. . . .  It is clear the individuals at the scene could have no reasonable expectation of privacy, or any justifiable expectation that their statements and images were not being captured on [motor vehicle recordings produced by technology in the police officers' patrol cars], or by any number of cellphones for that matter.

<u>Pa. State Police v. Grove</u>, 161 A.3d 877, 902 (Pa. 2017).

Here, Plaintiff spoke to a group of fifteen to twenty employees that he supervised in an area accessible only to other SEPTA employees or employees of companies contracted by SEPTA to perform various services.  While there were two employees of an engineering firm hired by SEPTA in the cafeteria during the April 9, 2021 meeting, the cafeteria was not open for use by members of the general public.  Rather, the cafeteria was used to conduct official business such as hosting training sessions to SEPTA employees.  As such, he had a reasonable expectation of privacy that statements he made during the meeting in the cafeteria would not be available to the public or be recorded.

---

[18]  In <u>Kelly v. Borough of Carlisle</u>, the Third Circuit Court of Appeals stated that in <u>Agnew</u>, "the court noted that anyone in the squadroom could overhear the conversation, and the door to the squadroom was open at the time, such that people outside the room could also hear the conversation."  622 F.3d 248, 257 (3d Cir. 2010) (citing <u>Agnew</u>, 717 A.2d at 524).

Accordingly, when viewing the facts in Plaintiff's favor, he has established all four prongs of his prima facie case of interception under the Wiretap Act.  He also has established a prima facie case of illegal use of the recording under the Wiretap Act based on Ziegler's use of the recording during the June 4, 2019 meeting and beyond.

Because Plaintiff has produced enough evidence for a reasonable factfinder to find that he made a good faith report of wrongdoing—the first element of a violation of the Wiretap Act—the Court will now turn to the second prong of Plaintiff's prima facie whistleblower retaliation claim: whether there is a causal connection between his protected activity and Defendant's adverse employment action.

### b.    Causal Connection

To establish a causal connection under the Pennsylvania Whistleblower Law, a plaintiff

> has to "show by concrete facts or surrounding circumstances that the report [of wrongdoing] led to his dismissal, such as that there was specific direction or information he received not to file the report or there would be adverse consequences because the report was filed."

Bailets v. Pa. Tpk. Comm'n, 123 A.3d 300, 308 (Pa. 2015) (citations omitted).  Generally, a plaintiff also can establish a causal connection between his or her reporting of wrongdoing and retaliatory action by producing evidence of the "temporal proximity between the protected activity and the alleged discrimination" or "the existence of a pattern of antagonism in the intervening period."  Brennan v. City of Phila., No. 18-1417, 2020 WL 3574454, at *12 (E.D. Pa. June 30, 2020), aff'd, 856 F. App'x 385 (3d Cir. 2021) (discussing the evidence in a case alleging retaliation under the Pennsylvania Whistleblower Law that can show a causal connection).  In Blakney v. City of Phila., the Third Circuit summarized the applicable law on the issue of temporal proximity:

> We have found that a temporal proximity of two days in unusually suggestive of causation, see Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment for the defendant when plaintiff was fired two days after his

employer received notice of his EEOC complaint), but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000).

559 F. App'x 183, 186 (3d Cir. 2014); see also Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (reaffirming that two days between protected activity and adverse action is unduly suggestive and establishes causation).

Here, Plaintiff was transferred to Fern Rock Station on the same day that he told Ziegler that he believed Evans had illegally recorded him without his knowledge or consent during the April 9, 2021 meeting.  Same-day retaliation is unduly suggestive of a causal connection between his report of wrongdoing and the retaliation against him for doing so.  The retaliatory motive is evident.  Consequently, since Plaintiff has shown that he reported wrongdoing and that there was a causal relationship between his reporting and his transfer to Fern Rock Station, he has established a prima facie case of retaliation under the Pennsylvania Whistleblower Law and the existence of a genuine dispute of material fact on whether this Law was violated.

> **2.     SEPTA Has Provided a Legitimate Non-Retaliatory Reason for Transferring Plaintiff**

Under the McDonnell Douglas burden-shifting framework, once a plaintiff has pled a prima facie case, the burden of production shifts to the defendant to articulate some legitimate non-retaliatory reason for the challenged employment action.  Here, SEPTA has provided a legitimate non-retaliatory reason for Plaintiff's transfer to Fern Rock Station in response to his claims of retaliation under the Whistleblower Law.  To meet its burden, SEPTA relies on Plaintiff's "use of inappropriate language towards subordinates and his suggestion that they abuse and violate SEPTA's policies concerning overtime, FMLA, sick leave and contractual quotas."  (Doc. No. 31-2 at 18.)  This evidence would provide a legitimate reason for the transfer.

**3.     Genuine Disputes of Material Fact Exist as to Whether SEPTA's
        Proffered Legitimate Non-Retaliatory Reasons for Terminating
        Young Were Mere Pretext**

Finally, if the defendant meets its burden of production, a plaintiff must show under the

last step of the <u>McDonnell Douglas</u> framework that the legitimate reason offered by the defendant

is mere pretext for retaliation.  See <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 427 (3d Cir. 2013) (citing

<u>Fuentes v. Chrysler Fin. Corp.</u>, 32 F.3d 759, 763 (3d Cir. 1994)).  To survive summary judgment,

a plaintiff must:

> prove that the employer's reasons for [the adverse employment action] were
> pretextual.  He may do so by "point[ing] to some evidence, direct or circumstantial,
> from which a factfinder could reasonably either (1) disbelieve the employer's
> articulated legitimate reasons . . . or (2) believe that an invidious [retaliatory] reason
> was more likely than not a motivating or determinative cause of the employer's
> action."

<u>In re Tribune Media Co.</u>, 902 F.3d 384, 402 (3d Cir. 2018) (alterations in original) (citing <u>Fuentes</u>,

32 F.3d at 764).  As the Third Circuit explained in <u>Canada v. Samuel Grossi & Sons, Inc.</u>:

> An employee may meet [his] burden by "painting the [employer's articulated
> reasons] as weak, implausible, contradictory, or incoherent."  Or, for example, "by
> showing that the employer in the past had subjected [the employee] to unlawful
> discriminatory treatment, [or] that the employer treated other, similarly situated
> persons not of his protected class more favorably."

49 F.4th 340, 347 (3d Cir. 2022) (footnotes omitted) (alterations in original) (citing <u>Fuentes</u>, 32

F.3d at 764-65).  In the retaliation context, a plaintiff can establish pretext by showing that an

employer's reasons for taking adverse action against him or her were "more likely [than not]

motivated by retaliation."  <u>Id.</u> at 349.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to

Plaintiff, there are genuine disputes of material fact regarding whether a retaliatory motive was

more likely than not the determinative factor of transferring Plaintiff to Fern Rock Station and that

the reason for the transfer was mere pretext.  Plaintiff testified at his deposition that he believes

21

that Ziegler wrote the Written Warning because Ziegler "had a personal vendetta against [him],

because [he] stood up to Joseph Metz months prior," and due to his write-up of Corey Evans.

(Doc. No. 23-5 at 116, 118.)   Specifically, Plaintiff testified that both Metz and Evans were

Ziegler's friends and that Ziegler transferred Plaintiff because he disagreed with Metz's direction

to write up an employee who was using a phone while on duty and because he wrote up Evans

after Evans said that he was "untouchable" because of his friendship with Ziegler.  (Id. at 116-17.)

If a reasonable jury credited Plaintiff's testimony, there is sufficient evidence from which it could

conclude that, for these reasons, Ziegler more likely than not transferred Plaintiff and issued to

him the Written Warning based on a retaliatory motive.  Accordingly, Defendant is not entitled to

summary judgment on Count I of the Complaint.

> **B.** **Summary Judgment Will Be Granted in Defendant's Favor on the Section 1981 Reverse Race Discrimination Claim Alleged in Count II of the Complaint Because Plaintiff Fails to Identify a Policy, Custom, or Deliberate Indifference by Defendant as Required under <u>Monell</u>**

In Count II, Plaintiff alleges that Defendant engaged in unlawful intentional discrimination

against him because of his race, in violation of 42 U.S.C. § 1981.  (Doc. No. 1 at 7.)[19]  Section

1981 is a federal statute, a violation of which can only be asserted under § 1983.  However, § 1983

---

[19] Defendant argues that Plaintiff's § 1981 claim fails because (1) SEPTA is a state actor and (2) state actors cannot be sued under § 1981.  (Doc. No. 31-2 at 20.)  The Court disagrees, however, and will treat Plaintiff's request for relief as a claim asserted under 42 U.S.C. § 1983.  <u>See</u> <u>Johnson v. City of Shelby</u>, 574 U.S. 10, 11 (2014) ("[N]o heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim.") (citing <u>Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit</u>, 507 U.S. 163, 164 (1993)).  SEPTA can be sued under § 1983.  <u>See</u> <u>Bolden v. Se. Pa. Transp. Auth.</u>, 953 F.2d 807, 821 (3d Cir. 1991) (<u>en</u> <u>banc</u>) (Alito, J.).

In his Supplemental Memorandum, Plaintiff "requests leave to amend his Complaint to assert a cause of action under section 1983."  (Doc. No. 46 at 2.)  The Court, therefore, will treat the discrimination claim alleged in Count II as being asserted under § 1983.  Nonetheless, for reasons stated <u>infra</u>, Defendant is entitled to summary judgment on Count II.

requires Plaintiff to identify a policy, custom, or deliberate indifference by Defendant before it can be held liable under § 1983 for his discrimination claims.

In <u>Jett v. Dallas Indep. Sch. Dist.</u>, the United States Supreme Court held that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." 491 U.S. 701, 733 (1989); <u>see also</u> <u>McGovern v. City of Phila.</u>, 554 F.3d 114, 121-22 (3d Cir. 2009) (interpreting <u>Jett</u> and holding that "no implied private right of action exists against state actors under 42 U.S.C. § 1981"). In other words, as noted, a violation by a state actor of the rights guaranteed in Section 1981 can be challenged only by an action brought under § 1983. The Third Circuit has held that SEPTA is a state actor under § 1983. <u>See</u> <u>Bolden</u>, 953 F.2d at 821. Because SEPTA can be sued only under § 1983 in this case, § 1983 first must be discussed. <u>See</u> <u>id.</u>

"Section 1983 subjects to liability those who deprive persons of federal constitutional or statutory rights 'under color of any statute, ordinance, regulation, custom, or usage' of a state." <u>Kach v. Hose</u>, 589 F.3d 626, 646 (3d Cir. 2009) (quoting <u>Leshko v. Servis</u>, 423 F.3d 337, 339 (3d Cir. 2005) (citation omitted)). "Thus, a plaintiff seeking to hold an individual liable under § 1983 must establish that she was deprived of a federal constitutional or statutory right by a state actor." <u>Id.</u> (citing <u>Benn v. Universal Health Sys.</u>, 371 F.3d 165, 169-70 (3d Cir. 2004)).

> Section 1981, on the other hand, provides, in pertinent part:
>
> All persons within the jurisdiction of the United States shall have the same . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .
> . . .
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a), (c). This statute "prohibits employment discrimination on the basis of race."

<u>Ali v. Woodbridge Twp. Sch. Dist.</u>, 957 F.3d 174, 180 (3d Cir. 2020).

"Pursuant to the Supreme Court's holding in <u>Monell</u>, a city is only liable under § 1983 for constitutional violations that are caused by its official policies and customs."  <u>Porter v. City of Phila.</u>, 975 F.3d 374, 383 (3d Cir. 2020) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978)).  "For the purposes of § 1983, SEPTA is treated as a municipal agency when determining its liability, if any."  <u>Brown v. SEPTA</u>, 539 F. App'x 25, 27 (3d Cir. 2013) (citing <u>Monell</u>, 436 U.S. at 691-92).  Therefore, SEPTA can only be held liable for an unconstitutional policy, custom, or practice."  <u>Id.</u>  "In contrast, if the conduct was simply that of an individual employee who was not acting pursuant to a policy or custom, that conduct cannot give rise to municipal liability under <u>Monell</u>."  <u>Porter</u>, 975 F.3d at 383.  Thus, Plaintiff must demonstrate that genuine disputes of material fact exist regarding both of the following prongs of his Section 1983 claim against Defendant:  (1) a constitutionally or statutorily protected right has been violated; and (2) the alleged violation resulted from a SEPTA policy, custom, or deliberate indifference.  <u>See</u> <u>Monell</u>, 436 U.S. at 690.

Because racial discrimination violates the rights guaranteed in § 1981, alleged violations by municipal agencies can be redressed under § 1983.  However, because Plaintiff has failed (1) to identify a policy or custom of racial discrimination adopted or promulgated by SEPTA or (2) to show that SEPTA's failure to train its managerial employees to not engage in racial discrimination amounts to deliberate indifference to the rights of people who come into contact with those employees, the Court need not discuss whether Plaintiff established the first prong under <u>Monell</u>— the violation of a constitutionally or statutorily protected right.  <u>See</u> <u>Range v. AG United States</u>, 53 F.4th 262, 269 (3d Cir. 2022) ("The moving party is entitled to judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case

with respect to which she has the burden of proof.'") (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).

In <u>Baloga v. Pittston Area Sch. Dist.</u>, the Third Circuit described a plaintiff's burden under <u>Monell</u> of showing a municipal policy or custom:

> A municipality may be held liable pursuant to 42 U.S.C. § 1983 only if a plaintiff is able to identify such a policy or custom. <u>See</u> <u>A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.</u>, 372 F.3d 572, 580 (3d Cir. 2004).  That requires a plaintiff to show, for a policy, that an official with final decision-making authority has "issue[d] an official proclamation, policy, or edict," <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990), or, for a custom, that a course of conduct, though not authorized by law, was "'so permanent and well settled' as to virtually constitute law," <u>id.</u> (quoting <u>Monell</u>, 436 U.S. at 690).  In either case, the policymaker, as defined under state law, must be "responsible either for the policy or, through acquiescence, for the custom."  <u>Andrews</u>, 895 F.2d at 1480-81.

927 F.3d 742, 761 (3d Cir. 2019).

There are several ways a plaintiff may establish the existence of a municipal policy to establish municipal liability under <u>Monell</u>.  For example, a plaintiff may cite to an official policy. <u>See</u> <u>Monell</u>, 436 U.S. at 690 (holding that a municipality may be sued under § 1983 when it "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"); <u>see also</u> <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 263 (3d Cir. 2010) ("'Policy' includes official proclamations made by municipal decisionmakers with final authority . . . .").  In addition, a policy also may exist where a municipality delegates to its employees the authority to set policy or where it ratifies actions taken by employees without policymaking authority.  <u>See</u> <u>Kelly</u>, 622 F.3d at 264.  Here, it is undisputed that Plaintiffs identify no "official proclamation, policy, or edict" showing that SEPTA engages in unlawful discrimination of its employees because of their race.  <u>Baloga</u>, 927 F.3d at 761 (quoting <u>Andrews</u>, 895 F.2d at 1480).

Turning next to custom, a plaintiff can show custom in a variety of ways.  For instance, he or she can make specific reference to "multiple incidents" which establish a particular custom.  See Harris v. City of Phila., 171 F. Supp. 3d 395, 401-02 (E.D. Pa. 2016) (finding a custom where there were "multiple incidents" of police officers using reckless and excessive force in their use of batons).  However, "at summary judgment a non-moving party may not rest on mere allegations." Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 193-94 (3d Cir. 2009) (citing Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992)).

Plaintiff, however, has not identified other instances in which Defendant engaged in unlawful race discrimination against its employees in similar circumstances.  Plaintiff's allegations that other management-level employees were not disciplined for engaging in inappropriate behavior unrelated to racial animus is sparse and does not rise to the level of showing that Defendant engages in race discrimination against its employees in a way that is "permanent and well settled as to virtually constitute law."  Kelly, 622 F.3d at 264 (citing Berg, 219 F.3d at 275). Accordingly, Plaintiff has failed to identify any applicable custom that renders SEPTA liable under Section 1983 for unlawful race discrimination.  Rather, Plaintiff only challenges the action of two employees—Ziegler and Evans—who were not acting pursuant to any allegedly unconstitutional policy or custom.  This is insufficient to establish a municipality's liability under Monell.  See Porter, 975 F.3d at 383.

Although Plaintiff does not specifically allege that Defendant was deliberately indifferent to the constitutional rights of individuals who encounter its employees, because Plaintiff referred to other instances where Ziegler and Joe Metz were not disciplined after engaging in inappropriate behavior, deliberate indifference under § 1983 nonetheless will be discussed.

A plaintiff pleading a failure to discipline claim under § 1983 "must identify a failure to provide specific [discipline] that has a causal nexus with their injuries and must demonstrate that the absence of that specific [discipline] can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." Stokes v. City of Phila., No. 22-338, 2023 WL 362006, at *8 (E.D. Pa. Jan. 23, 2023) (internal quotation marks omitted) (citing Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997)).   The plaintiff must show "both contemporaneous knowledge of the offending incident or knowledge of a pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998).

Plaintiff here, however, offers no evidence that any alleged failure to discipline Ziegler or Metz demonstrates deliberate indifference by SEPTA to his constitutional or statutory rights. Moreover, Plaintiff testified at his deposition that he does not know whether Ziegler was disciplined for making inappropriate comments to Ziegler's supervisor.  Furthermore, Plaintiff does address whether Metz was disciplined for his sexually inappropriate text message to a female employee.  Plaintiff, thus, cannot assert that anyone with supervisory authority over Ziegler or Metz took any action or failed to take action that conveyed "a message of approval to the offending subordinate." Id.  Therefore, Plaintiff has not identified sufficient evidence to permit a reasonable trier of fact to find that Defendant was deliberately indifferent to his statutory rights guaranteed under § 1981.

Because Plaintiff has not identified a policy, custom, or deliberate indifference by Defendant as required by Monell under which it can be held liable for Ziegler's allegedly discriminatory actions against him, Plaintiff's § 1981 claim against Defendant fails as a matter of

law.  Defendant, therefore, is entitled to summary judgment on Count II.  <u>See</u> <u>Range</u>, 53 F.4th at

269 (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

### V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 31) will

be denied on Count I and will be granted on Count II.  An appropriate Order follows.